IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARCUS KOSTOLICH, individually,
and KOSTOLICH GROUP, INC.,
a Florida Corporation,

       Plaintiffs,

vs.

L-3 COMMUNICATIONS CORPORATION, a
Delaware Corporation,

       Defendant.

_____/

CASE NO: 6:11-cv-80-Orl-19DAB

## COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, DAMAGES, AND TRIAL BY JURY

      Plaintiffs, MARCUS KOSTOLICH, individually, (hereinafter referred to as "KOSTOLICH"), and KOSTOLICH GROUP, INC., (hereinafter referred to as "KGI"), a Florida Corporation, by and through its undersigned counsel, file this their Complaint for Injunctive Relief, Declaratory Judgment, Damages, and Trial by Jury against the Defendant, L-3 COMMUNICATIONS CORPORATION, a Delaware Corporation, and state as follows:

### INTRODUCTION
### (Applicable to all Counts)

      1.    This is an action for injunctive relief and money damages against Defendant, L-3, related to its conduct and the conduct of an internal "Division" of L-3, known as Coleman Aerospace, (hereinafter "CAD"), for: Deliberate Breach of Contract; Fraud in the Inducement; Violation of Chapter 688, Florida Statutes, commonly referred

1

to as the Florida Uniform Trade Secrets Act; Common Law Misappropriation of Confidential and Proprietary Information; Tortious Interference with Advantageous Business Relations; Unfair Competition; Unjust Enrichment; Misappropriation and Infringement of Patent Rights Belonging to Plaintiffs; Imposition of an Equitable Lien; Request for an Accounting; Conversion; and Declaratory Relief pursuant to the provisions of Chapter 86, Florida Statutes.

2.      The foregoing causes of action arose when Defendant, L-3, through CAD, invited KOSTOLICH to enter into an Agreement to provide his Business Plan and intellectual property to Defendant in exchange for Defendant agreeing to participate with Plaintiff, KOSTOLICH, in creating and developing a business in the Coal Dust Compaction Mitigation arena, i.e., the Coal Dust Compaction Mitigation Project, (the "Project"), a business arena in which KOSTOLICH was intimately involved prior to his introduction to L-3 and where he had developed specific intellectual property that would revolutionize how coal dust was remediated and/or mitigated.

3.      Due to Defendant, L-3's, actions, KOSTOLICH has suffered and will continue to suffer irreparable injuries and damages.

## PARTIES
### (Applicable to all Counts)

4.      Plaintiff, MARCUS KOSTOLICH, is a Florida resident residing in Orlando, Orange County, Florida, and Plaintiff, KOSTOLICH GROUP, INC., is a Florida corporation with its principal place of business in Orange County, Florida. KOSTOLICH is well known in the railroad industry and, specifically, the transportation and logistics area, and in the arena of successful business development and the promotion of business ventures throughout the United States and the world.

2

5.      Defendant, L-3, has a Division called Coleman Aerospace, (hereinafter "CAD"), which is in the aerospace industry with its principal business location at 7675 Municipal Drive in Orlando, Orange County, Florida 32819. Defendant, L-3, is similarly in the aerospace and defense contracting industry, along with numerous other industries, with its principal place of business located at 1320 Braddock Place, Sixth Floor, Alexandria, Fairfax County, Virginia 22314, and its corporate headquarters located in New York City, NY.

6.      Coleman Aerospace is a division of L-3 Communications and an alleged supplier of systems engineering, systems integration, and payload launch services.

7.      Coleman Aerospace grew from the Coleman Research Corporation (CRC), established in Orlando, Florida in 1980.

8.      Coleman Aerospace was established in 1996 to perform Coleman aerospace hardware and flight vehicle programs.

## JURISDICTION AND VENUE
### (Applicable to all Counts)

9.      Venue is proper in the United States District Court, Middle District of Florida, for the above-stated reasons and additionally pursuant to 28 U.S.C. § 1391, as the subject Agreement was entered into and executed in Orange County, Florida.

10.      This Court has subject-matter jurisdiction over this matter for the above-stated reasons and additionally pursuant to 28 U.S.C. § 1332, as the Plaintiffs are citizens of the State of Florida, and the Defendant is a citizen of the State of Delaware, its State of incorporation, and has its principal place of business or "nerve center" in the State of Virginia.

11.      This is an action for damages in excess of $75,000.00, exclusive of interest, attorney's fees, and costs.

3

## FACTS

12.     KOSTOLICH was induced to enter into a business enterprise with CAD because of their representation to the business world of its ethical principles set forth in its various Mission statements, which turned out to be ***clearly false and deceptive***.  L-3 Communications represented to KOSTOLICH and to the business public that the "cornerstone" of its operating philosophy is the *"integrity in how we conduct ourselves with our customers, co-workers, and competition.  We believe firmly in **'doing the right thing'** at all times and have enthusiastically endorsed the many L-3 Communications initiatives on its Code of Ethics and Business Conduct.  These codes provide all of our employees with a framework on how we should conduct ourselves **with our business partners and each other.  We expect our leadership and front-line employees <u>to adopt these principles in spirit</u> and in action.**  With professional services being the core of our operation, our people are the lifeblood of our business.    Ethical conduct by all employees is imperative if we are to maintain a reputation that supports our growth plans and helps us to achieve our financial success."*

13.     Additionally, CAD represented to the world and to KOSTOLICH that it required its employees to abide by a **"Code of Conduct"** which states its intent to "Be honest, ethical, and fair in everything we do."  Defendant, L-3, through CAD, represented additionally to have an **"Ethics and Integrity"** policy that claims it promotes such conduct by:

- Creating a climate of ***mutual trust and respect that drives open and honest communication.***

- Operating in an open environment where employees are encouraged to express ideas, concerns, and possibilities.

- ***Honest,*** committed internal and ***external relationships.***

- Doing what's right for our customers and for the company.

14.     Initially, Defendant, L-3, through CAD, hired KOSTOLICH to provide certain consulting services under a document entitled "Consulting Agreement," a copy of which is attached hereto as Exhibit "A," to assist L-3 with some specific business needs. The "Consulting Agreement" is <u>not</u> the "Agreement" that forms the basis of this litigation.

15.     Only after gaining KOSTOLICH'S trust, did CAD encourage KOSTOLICH to disclose his concept on how to meet a primary need of the coal mining communities in America to reduce and eliminate coal dust from the railroads that transported the coal from the mines to its destinations. This disclosure was based on a mutual understanding that CAD would supply an essential component to the implementation of KOSTOLICH'S coal dust removal concept by providing the engineering and financial strength needed to design and fund the equipment required to implement his concept. The "Agreement" entered into between Plaintiffs and Defendant, through its agent, servant, and managerial employee, Mark D. Stephen, (Stephen), was initially oral, but was then verified by the writings thereafter created.

16.     The "Agreement" and the related terms entered into, accepted, and verified that form the basis of the claims Plaintiffs have against Defendant, L-3, ultimately became a document entitled "Business Plan," a copy of which is attached

hereto as Exhibit "B," and incorporated herein by reference and which specifically sets forth the Coal Dust Compaction Mitigation Project created by KOSTOLICH.

17.    The Business Plan had been co-authored and ratified by Defendant through its representative, Stephen, in a draft of the "Executive Summary" dated January 2009, a copy of which is attached hereto as Exhibit "C," and incorporated herein be reference. Exhibit "C" contains evidence of clear ratification of the actual "Agreement" entered into between Plaintiffs and Defendant.

18.    The aforementioned "Consulting Agreement" was to be governed by the specific "Task Orders" attached or issued by CAD.    The Coal Dust Compaction Mitigation Project "Agreement" between KOSTOLICH and CAD was not limited in any way by the "Consulting Agreement" entered into with L-3, as the "Consulting Agreement" never covered the Coal Dust Compaction Mitigation Project, as no "Task Orders" were ever issued for KOSTOLICH'S project because it was never understood by Stephen to be a part of that "Consulting Agreement".

19.    L-3 acknowledged these separate business entities in numerous written communications from Stephen, on behalf of L-3. Numerous emails from Stephen confirm the effort put forth by KOSTOLICH and KGI, the terms of the joint venture, consortium or partnership agreement, and the royalties to be paid specifically to KOSTOLICH and KGI.

20.    KOSTOLICH was, in fact, the "sole creator" of the "process" related to the Coal Dust Compaction Mitigation Project. He was the driving force behind creating a potentially significant, but importantly separate and distinct business opportunity for L-3.

21.     The "Executive Summary" co-authored by Stephen and KOSTOLICH in January 2009, attached as Exhibit "C," contains "redline" entries made by Stephen wherein, Stephen, in a clear effort to affirm KOSTOLICH'S proprietary interest in his coal dust concept and do what he knew to be right, suggested to KOSTOLICH that the agreed upon royalty of $1.20 per carload to KGI might be too high for Gascoyne Materials Handling and Recycling Company ("GMHR"), a potential third partner to the coal dust remediation venture.   As Stephen said in his own "redline" writing, "If you are pursuing other entities to secure this, it is probably best to not do that as a Coleman consultant. L-3 will view your rights under the Consultant agreement to be limited."

22.     Stephen knew that the Business Plan, i.e., the "invention" KOSTOLICH had created, was never intended to be limited by any "Consulting Agreement." KOSTOLICH relied on Stephen's actions and representations, and continued to provide time, knowledge and energy to help bring to fruition this joint venture project.

23.     At all times material hereto, Stephen was the managing agent, servant, and/or employee of CAD and L-3, acting for and on behalf of both, and his statements were binding on behalf of both based on his position as a Vice President of CAD.

24.     The "intellectual property" was entirely that of KOSTOLICH.   Having spent thirty plus years in the railroad industry allowed KOSTOLICH to think his way through to a solution for a long-standing problem that could substantially and positively impact involved businesses, as well as the environment.

25.     KOSTOLICH and KGI unequivocally and clearly brought the Coal Dust Compaction Mitigation Project, i.e., the "invention," and the business opportunity to Coleman Aerospace (CAD) as a new business development project partnered between

7

KOSTOLICH and CAD.  KOSTOLICH advised Stephen that KGI did not bring such an idea, attendant revenues and great profit opportunities to anyone without participating in the upside of the business once it was created.  That had been the KGI business model for years. KOSTOLICH specifically asked Stephen about a different type of agreement and Stephen responded that it would be difficult to create one related to the Coal Dust Compaction Mitigation Project, but also unnecessary.

26.     KOSTOLICH knew if CAD wanted to participate in the Coal Dust Compaction Mitigation Project, CAD had to share the financial benefits with KGI to develop the Project utilizing KOSTOLICH's intellectual property.  If this was not agreeable, then KGI would have not gone forward with CAD, and would have sought other partnership opportunities for the "Project."  In addition, if CAD was not agreeable with sharing the financial benefits of the Project with KGI, KGI would have only focused on the limited tasks of the "Consultation Agreement" for which it was engaged that were solely for the enrichment of CAD as identified in Exhibit "A." KGI was never provided a Statement of Work for the Coal Dust Compaction Mitigation Project with CAD.  CAD had no idea as to what work had to be done to create this business, and relied on KGI to structure this business for eventual presentation to L-3 and thereafter prospective suitors. KGI's relationship with CAD began in November 2007.  The vast bulk of the business development work related to the Project was performed in 2008.  As the Executive Summary, dated January 2009 indicates, the major part of KOSTOLICH's work for the joint venture had been completed at that time.

27.     The Statement of Work contained in the "Agreement," attached hereto as Exhibit "A," identified only "Technical Services." KGI does not provide technical services, as KOSTOLICH is not an engineer or a technician.

28.     Additionally, the only NDA (non-disclosure agreement) KOSTOLICH signed is dated November 7, 2007, excluded the Coal Dust Compaction Mitigation Project, and only described existing CAD products. CAD was a firm that had absolutely *no* experience or knowledge of coal, coal loading technology, coal cars, railroad operations, or the like. CAD had no clue as to what design route to travel without KGI explaining the concepts of "profiling" and "plowing," which needed to be the basis of whatever technology that was developed.

29.     KOSTOLICH'S "intellectual property" was the only intellectual property that initially existed to create this business and promote the Coal Dust Compaction Mitigation Project. This intellectual property consisted of the following:

1.  Mechanically re-profiling or "plowing" the crown of coal above the top cord, to a level equal to the top cord, as the first step.

2.  Mechanically compacting the coal to force its settling to being level with the top cord or below.

3.  Mechanically rebalancing the coal that is overloaded on one end of the coal car that is normally at the rear of the car as it is moving through the loading facility.

4.  Elimination of any coal on the side and end sills.

5.  Electronic identification of the coal train customer as it moves through the compaction station for EDI billing within 24-hours.

30. The "initial disclosure" provided by KOSTOLICH relating to the "Project" happened in a conference call on November 21, 2007, between himself, Stephen and Stuart H. Thomson of Downers Grove, Illinois, with whom KOSTOLICH had a prior, trusting relationship. KOSTOLICH, trusting the ethical representations of CAD, shared the basic details of his concept of how to efficiently provide a coal dust remediation solution to the coal industry in the Powder River Basin.

31. Additionally, KOSTOLICH discussed with Stephen the marketing and the engineering technology needed to solve this problem. Thompson participated in these discussions with Stephen. The issue of re-profiling the coal loads on the cars was explained and it was suggested that the level of coal had to be dropped to the top cord of the coal cars. There was plenty of room in the coal cars to spread the load to be equal to or less than the height of the coal car top cord. CAD had no idea about any of the issues and had to be led along a technological development path, which KOSTOLICH and KGI provided.

32. In following up on bringing this separate business opportunity to fruition, on or about April 11, 2008, and pursuant to discussions with Stephen, KOSTOLICH, began working on a "White Paper" on how to position the various partners who would be necessary to market and bring to fruition the coal compaction concept, and how to share the profits between such partners resulting from the venture. On April 17, 2008, KOSTOLICH completed the White Paper and provided this to CAD and Stephen. The "White Paper" proposed creating a LLC Joint Venture Company between CAD, KGI and two other companies needed for software development and manufacturing. CAD would receive 70% ownership, KOSTOLICH would receive 5% ownership, with the rest of the

ownership being divided between the other necessary companies. A copy of the "White Paper" is attached hereto as Exhibit "D." This paper reaffirmed the oral understanding of the parties regarding KGI's separate business relationship with L-3 related to the "Project," and was a foundation document for the Business Plan and the Executive Summary. See Exhibits "B" and "C."

33. With the essence of the business relationship between KGI and L-3 now ratified in writing between the parties, on May 1, 2008, KOSTOLICH agreed to be involved in a technical meeting involving the following: Vice President of Engineering, Greg Grimes; Director of Programs, Jerry Barone; Senior Mechanical Engineer, Charles Nyquist (Nyquist); Lou Deeter, the then President of CAD; and Stephen. At this technical meeting, the attendees discussed the detailed technology needed to implement the "Project," and Mr. Grimes and KOSTOLICH discussed his ideas on how his concept should work, including a "profiling system" based on an air dryer design implemented at car washes. This air dryer design had insufficient downward force to be workable, yet KOSTOLICH's idea set out the conceptual design that would form the foundation on a product that would work.

34. KOSTOLICH was instrumental in the design of the equipment to carry out the "Project" from the inception, particularly, based on his interaction with Stephen and Nyquist. Attached hereto, marked as Composite Exhibit "E," and incorporated herein, are example emails exchanged identifying input provided by KOSTOLICH in reference to design, function, and implementation of the "System" that would perform the vibratory compaction and mitigation:

(1)     a necessary redundancy system;

11

(2)     design of the automated system that would be installed at coal train loading facilities;

(3)     the fact that railroads could not afford to have the equipment out of service, as the railroads could be fined by the EPA for not handling the dust problem, because failing to do so could create an EPA problem for the railroads;

(4)     that a backup for the computer program was necessary and the computer program needed to separate from its clone or twin so a malfunction did not render the other program unusable;

(5)     the control cab or room needed to reside above the coal cars so the operator could observe the process and the condition of the coal before and after the system re-profiled the load;

(6)     the redundancy needed to be built into the "product," meaning two profiling/vibrator compactors in place, but using only one for the work that needed to be done;

(7)     design of the structure holding the compaction equipment;

(8)     the video of the "System;"

(9)     the method of grooming and compacting of the loaded cars; the fact they needed to be careful not to push coal to the end of the cars so that the weight of the coal is greater at one end than at the front-end or anywhere else on the coal car, as the increased weight could and would impact the maintenance costs on the trucks and could shut the Project down;

(10)   the   needed   catwalks   that   allow   for   access   to the groomer/compactor for servicing and repair;

(11)   the design to accommodate the locomotives based on the two predominant locomotive types to haul coal unit-trains, i.e.,  the GE AC 4400CW and the EMD SD70-Ace, which are alternating current locomotives with considerably higher tractive effort than the DC models;

(12)   the specifications of the noted alternating current locomotives that needed to be taken into account, which necessitated that the groomers/compactors be at least 17' above rail to accommodate additional height of a locomotive which railroads might add, including air horns;

(13)   the drum roller for testing performed in Decker, Montana, with KOSTOLICH being called upon by Stephen in reference to design input and for which KOSTOLICH provided same;

(14)   calculations relative to the compaction equipment structure and equipment productivity;

(15)   input related to the time a train would take to move through the System and how long the grooming process would take relative to the involved speed;

(16)   the placement of sensors and readers on the front skeletal structure;

(17)   a second structure with two compaction units retracted at the top and positioned longitudinal on the track;

(18)   the distance that would be required between the first and second skeletal structures;

(19)     the height of the skeletal structures at 20' so as to be able to clear the locomotives and any equipment that might be affixed;

(20)     whether in operation the rear compactor would be operating with the front compactor in reserve;

(21)     whether an operator's cab was necessary in light of the automated nature of the System;

(22)     and numerous other areas where KOSTOLICH had intimate involvement from day one related to the "Project," including all relevant analyses related to the financial prospects of promoting such a venture with CAD, KOSTOLICH, and KGI.

35.     Defendant's managerial representative, Stephen, Vice President of Strategic Planning/Business Development and Ethics Officer, advised KOSTOLICH that CAD was going to hire an individual to serve as a Project Manager in Stephen's small Business Development Group.   Michael A. McCurdy, ("McCurdy"), who had no expertise in the coal dust mitigation arena, was hired in the late first quarter of 2009, and was to become KOSTOLICH'S principal working contact within CAD in reference to the Project. KOSTOLICH first met McCurdy in early April 2009.

36.     After L-3 had the opportunity to review and analyze the Business Plan prepared by KOSTOLICH and Stephen, they saw the great financial potential that the Project could mean to it, they decided they needed to convert the entire financial benefit of this project to itself and therefore they had to surgically remove KOSTOLICH from the project and position him as a paid consultant who would subsequently have no proprietary interest in his intellectual property.

14

37.    Email communications began between KOSTOLICH and McCurdy on April 21, 2009. CAD had appointed McCurdy to carry out the plan to covertly separate the intellectual property from KOSTOLICH, the inventor of the Project, a plan that Stephen apparently would struggle with personally to carry out.    On May 5, 2009, Stephen assured both KOSTOLICH and Jepland, who had submitted a Letter of Intent on the purchase of a primary interest in the "Project," that neither Stephen nor L-3 were talking to any third party to try to cut a behind-the-back deal on the "Project." Stephen asserted that if such an underhanded deal were to transpire, Stephen "may be needing a new job," further assuring that the "ethics in this company [L-3] will truly preclude that." Nevertheless, L-3, along with Stephen, were able to compromise their "ethics" to allow this exact thing to happen.

38.    Attached hereto, marked as Composite Exhibit "F," and incorporated herein are a few of the emails outlining the clandestine, surreptitious, and secretive scheme implemented by Defendant, L-3, that ultimately led to L-3 cutting KOSTOLICH out of the picture completely while stealing his intellectual property related to the Coal Dust Compaction Mitigation Project.

39.    On or about June 18, 2009, CAD initiated its next step to remove KOSTOLICH from the "Project," when Michael McCurdy claimed there was no budget money to continue paying KOSTOLICH.    Because KOSTOLICH had been led to believe that the coal compaction "Project" was a Joint Business Venture with CAD, KOSTOLICH continued to provide substantial time contributions to the "Project," and interfaced with prospective investors to try to keep the Project moving forward.

40.    As previously stated, KOSTOLICH had found and was primarily

15

instrumental in getting Jepland, on January 30, 2009, to submit a very beneficial Letter of Intent (hereinafter the "LOI"), and KOSTOLICH was awaiting the preparation of sale documents promised by the Defendant.   Under this transaction, KOSTOLICH would begin working with Jepland to coordinate activities between Jepland and CAD, and KOSTOLICH would be compensated through a new consulting agreement with Jepland in addition to receiving a monetary interest per carload.   This was a very valuable business transaction for KOSTOLICH.

41.   CAD, through McCurdy and others, planned to cut KOSTOLICH out of the picture completely, steal his intellectual property, and use the money he was entitled to under the proposed deal with Jepland to enhance the deal to a separate third party.

42.   As of June 18, 2009, four plus months had passed since the "LOI" was provided by Jepland and/or a request for sale documents was submitted by CAD allegedly to their corporate representatives at Defendant's corporate offices.   CAD and L-3 were intending to license or sell the technology identified in the Project to some other party not connected with KOSTOLICH, or anyone KOSTOLICH had brought in to work on the "Project."

43.   A meeting was tentatively scheduled to take place in Gillette, Wyoming, at Peabody Energy, one of the largest coal mine operators in the United States, on June 22, 2009, for CAD/L-3 to market the intellectual property brought to it by KOSTOLICH. In fact, CAD/L-3 used KOSTOLICH to get this meeting with Peabody, and KOSTOLICH was essential to setting up the meeting.   Except when CAD needed technical information from KOSTOLICH, all normal communication from CAD to KOSTOLICH broke down after the Peabody meeting. CAD provided KOSTOLICH no

written reports, nor did it provide to KOSTOLICH any communication as to what transpired, who attended, and what was discussed.

44.      The next correspondence of consequence between KOSTOLICH and McCurdy, was on July 7, 2009, relative to a meeting in Orlando KOSTOLICH had arranged between CAD and Burlington Northern Sante Fe Railroad (BNSF), with their two consulting firms involved in analyzing coal dust data.

45.      McCurdy commented on July 7, 2009, that KOSTOLICH was not going to be invited to attend the BNSF meeting because of lack of funds, but that *"you will hopefully have your hands full with the compaction – setting up the business infrastructure and sales/business development,"* an apparent recognition of the continuation of the joint venture on the Project.

46.      Ultimately, CAD amazingly *asked BNSF* for permission for KOSTOLICH to attend the meeting with BNSF, and BNSF agreed.

47.      A meeting was also set up by KOSTOLICH with Wabtec Corporation on the ARMS (Acoustic Rolling Stock Monitoring System) issue, which was related to actual "consulting" work KOSTOLICH was providing to CAD.  This ARMS project presumptively fell within the consulting agreement and was always separate and distinct from the Coal Dust Compaction Mitigation "Project."  Despite arranging the meeting, KOSTOLICH was purposely left out of the meeting by CAD.

48.      McCurdy, in CAD's continued effort to effect the gradual removal of KOSTOLICH, continued to bait him as if he was still involved in the "Project," which KOSTOLICH believed clearly would not have been moving forward if he were not an integral "partner" in the "Project."  KOSTOLICH and McCurdy traded further emails on

July 22, 2009, regarding a recommendation McCurdy attend the NCTA (National Coal Transportation Association) committee meeting in Denver, Colorado to be held on September 2009, an important event in moving the Project forward.

49.     On August 8, 2009, KOSTOLICH emailed McCurdy advising him of KOSTOLICH'S increasing loss of other business opportunities, the strained relationship that L-3 was creating with Jepland, and the negative impact on CAD financially if the unexplained delays continued with L-3 in preventing CAD from moving forward with the "Project."     This communication was presumably provided to the corporate representatives of L-3.

50.     In verbal discussions had with Stephen, KOSTOLICH learned the entire process with Jepland had allegedly stopped at the management level of L-3. Unbeknownst to KOSTOLICH, this excuse, along with the many other excuses provided to him and to Jepland, was a facade as CAD and L-3 had no intention of doing business with any group or entity brought to the table by KOSTOLICH.  See Exhibit "F" previously referenced.

51.     On August 29, 2009, McCurdy advised Stephen and KOSTOLICH that he had been given the authority to begin negotiating the sale of the compaction technology, i.e., the "Project."  The sale was intended to utilize the Business Plan and intellectual property KOSTOLICH had developed.  KOSTOLICH again encouraged CAD to make a presentation at the forthcoming NCTA Fall Conference in Denver, scheduled for September 2009. KOSTOLICH asked to attend this conference, but was told he did not need to do so, however, KOSTOLICH was to be in email contact with McCurdy while he was at the conference in Denver.

52.    On September 16, 2009, McCurdy traveled to Denver to make KOSTOLICH'S presentation of the Coal Dust Compaction Mitigation Project, which was well received, as KOSTOLICH knew it would be. KOSTOLICH asked McCurdy to fill KOSTOLICH in on the NCTA presentation and any discussion with Frank Visger, Manager of Coal Transportation, Sales and Quality for Peabody Energy, but McCurdy intentionally and purposely did not discuss the conference or discussions had with Frank Visger of Peabody Energy and intentionally did not reveal that he was talking to anyone about buying the coal dust compaction technology. Yet, while at the conference, McCurdy, continued to utilize KOSTOLICH'S expertise for estimates KOSTOLICH had developed for surfactant spraying.

53.    Ultimately, the fraud perpetrated against KOSTOLICH was accomplished by Defendant, L-3, licensing KOSTOLICH's intellectual property to a company called Crown Products & Services, LLC, ("Crown") a chemical spray firm based out of Indianapolis, Indiana, that in turn entered into negotiations with Peabody. Apparently, McCurdy used KOSTOLICH's surfactant spraying estimates in their discussions with Crown.   As KOSTOLICH subsequently learned, McCurdy, at the NCTA Fall Conference in Denver entered, into discussions concerning selling the intellectual property to or partnering with Crown in reference to same; Crown was interested in jumping into the coal compaction business; and, McCurdy was performing CAD's "due diligence" on the surfactant spray business, an area McCurdy similarly knew nothing about. Crown was interested in combining coal compaction and spray surfactant to solve the coal dust issue. Crown would become the only one stop shop for the delivery of these two solutions to a 100% elimination of the coal dust issue. KOSTOLICH filled McCurdy

in on all of the research he had already done on the surfactant spray solution to the coal dust issue.

54. When McCurdy attended the NCTA meeting in Denver in September 2009, in attendance at that conference was Philip Poletti, ("Poletti") the Vice President of Business Development for Crown. Upon information and belief, McCurdy intentionally, fraudulently, and willfully promoted the "Project" on behalf of L3/CAD to Crown through Poletti, and, upon information and belief, to Gregg Simmons, who was working with Crown. On behalf of CAD/L3, McCurdy promoted the position of CAD/L3 despite knowing full well that KOSTOLICH was the owner of the coal dust compaction intellectual property and that CAD/L3 had no authority to enter into any agreement regarding this venture without the consent of KOSTOLICH. McCurdy, as an authorized agent of CAD/L3, fraudulently failed to provide to Crown any information on the material proprietary ownership interest that KOSTOLICH had in the Project CAD was trying to sell.

55. On or about October 15, 2009, now many months late in being introduced to the marketplace, it became increasingly clear that McCurdy on behalf of CAD was holding the Project hostage. He no longer was including KOSTOLICH in any of the e-mail communication with Jepland or anyone else, claiming erroneously and deceptively that there was a "conflict of interest" in letting KOSTOLICH in on those discussions.

56. On October 20, 2009, KOSTOLICH made a request to McCurdy to meet to discuss the progress with Jepland and CWCP, another prospective suitor, brought to the table by KOSTOLICH. Also on October 20, 2009, McCurdy emailed Steve Landsman, a partner with Jepland, to talk to him about the allegedly pending prospective

deal.   Apparently, this was another ruse by McCurdy to keep both KOSTOLICH and Jepland frozen while CAD continued negotiation with Crown, as no meaningful contact took place.

57.     As of November 11, 2009, because of the lack of forthrightness on the part of CAD and McCurdy, KOSTOLICH continued to express his frustrations in several emails.  He emailed Stephen on November 20, 2009, with his comments and observations that he suspected something negative was transpiring because of the lapse of time and CAD/L-3's silence.  KOSTOLICH emailed McCurdy on December 8, 2009, and Stephen on December 14, 2009, but neither chose to respond with the truth of what CAD/L-3 was doing.   KOSTOLICH continued his efforts, hoping that L-3 would approve a licensing agreement for coal compaction with one of the two investors he had brought to the table.

58.     Finally, on January 12, 2010, Stephen responded that L-3 had assigned someone to write the final sale documents (internal legal counsel, Mark Stechschulte). KOSTOLICH felt that his Project was now finally going to become a reality.  However, as KOSTOLICH learned, it was not to be with Jepland or CWCP.  It was instead a clandestine, surreptitious, and secretive scheme for CAD to sell an exclusive license to an apparently innocent purchaser, Crown, which is now trying to complete an agreement with Peabody Energy.

59.     CAD never had the legal right to sell an exclusive license to the intellectual property owned by KOSTOLICH, and attempting to do so constitutes theft.

60.     In January 2010, the scheme continued with additional fraudulent conduct being perpetrated.  L-3 told CAD to have McCurdy move forward to end the potential conflicts CAD could have relative to the "teaming" agreements Stephen had created with

Gascoyne Materials Handling and Recycling Company (GMHR) in Dickinson, North Dakota, and Bill Solt's Stanrail Corporation in Gary, Indiana. Both of these companies had been brought to the table by KOSTOLICH and had been a part of his Business Plan.

61.     Solt actually contacted KOSTOLICH in mid-January because McCurdy had asked him to sign a release agreement with CAD, in order for CAD to move forward on the sale of the technology.   Solt asked KOSTOLICH what he should do and KOSTOLICH, because he was under the assumption that the release from Solt was necessary to sell the technology to Jepland, recommended Solt execute the release.

62.     On January 22, 2010, and January 29, 2010, KOSTOLICH sent emails to Stephen and McCurdy about finalizing the paperwork and getting started on the Project, which he now assumed after almost a year was going to come to fruition.   Neither of them told KOSTOLICH the truth, instead asserting they basically knew nothing and to just wait.

63.     On February 4, 2010, KOSTOLICH received a call from Stephen that "they," i.e., L-3 and CAD, were *selling the technology to another party and that L-3 wanted nothing to do with KOSTOLICH.*   L-3 took almost a year to make a decision to sell the business technology and intellectual property created by KOSTOLICH to Crown in the form of an exclusive license, while purposely keeping KOSTOLICH at bay, thereby hoping to complete a scheme to steal the Project from KOSTOLICH.   They did so successfully absent KOSTOLICH pursuing this action.

64.     McCurdy and allegedly Stephen had directions to move KOSTOLICH out of the business and to frustrate KOSTOLICH by lying to him, with such fraudulent actions going back to McCurdy's initial interface with KOSTOLICH beginning in April

2009. L-3, as an alleged successful Department of Defense contractor and aerospace engineering company, had the budget and resources to continue paying KOSTOLICH to create the business and to move the Project forward. The "corporate" delays were intended to frustrate KOSTOLICH and give CAD and L-3 a free hand to steal KOSTOLICH'S intellectual property and the entirety of the business he developed, i.e., the Project.

65.     As a result of the fraud and theft perpetrated, KOSTOLICH and KGI have suffered a loss estimated to be in excess of $7 million annually.

66.     All conditions precedent have been complied with by Plaintiffs and/or waived by Defendant, L-3.

**COUNT I**
**BREACH OF CONTRACT**

67.     KOSTOLICH and KGI adopt and re-allege each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

68.     KOSTOLICH's relationship to the Coal Dust Compaction Mitigation Project began with CAD and Stephen in November 2007. The business relationship on this Project between KOSTOLICH and CAD was codified in the White Paper dated April 18, 2008. The vast bulk of the Coal Dust Compaction Mitigation Project business development work related to the "invention," was performed in 2008. As the Executive Summary, dated January 2009 indicates, the work had already been done.

69.     Defendant, L-3, intentionally and materially breached the "Agreement" and the related terms entered into, accepted, and verified by Defendant, L-3, based on numerous documents including the document entitled "Business Plan," which was finalize by CAD (Exhibit "B,") incorporated herein by reference, and which specifically

relates to the Coal Dust Compaction Mitigation Project created by KOSTOLICH.  This finalized business plan provided under the "Financial" section that out of a price of $12,00 per car load to be charged by the Joint Venture, KGI would receive $1.20 per car load.  This Business Plan was further verified by Defendant through its representative, Stephen, in an Executive Summary dated January 2009, (Exhibit "C"), incorporated herein by reference.

70.    KOSTOLICH provided valuable consideration in the form of contributing his intellectual property that formed the basis of the Coal Dust Compaction Mitigation Project and said consideration was recognized and acknowledged by Defendant, including as follows with the following statements and positions being made or communicated by Defendant to Plaintiffs:

a.         That L-3 and CAD at all times would work in the best interests of the Coal Dust Compaction Mitigation Project "team" and that KOSTOLICH would at all times be protected, including that L-3 and CAD would honor the Agreement made with KOSTOLICH;

b.         That the Consulting Agreement entered into with KOSTOLICH and CAD was recognized by CAD and, specifically, Stephen, as a separate and distinct agreement that had nothing to do with the Coal Dust Compaction Mitigation Project;

c.         That the White Paper prepared for and acquiesced to by Stephen separated the Coal Dust Compaction Mitigation Project from the other consulting work being performed by KOSTOLICH for CAD.

d.         That the Business Plan created by KOSTOLICH would be

honored, including the payment of royalties to KOSTOLICH of $1.20 per carload under the Business Plan;

e.            That the intellectual property provided by KOSTOLICH and recognized by L-3 was, in fact, the intellectual property of KOSTOLICH, and would be cared for in an honorable manner by allegedly honorable men working for a company with a *Code of Conduct* and *Ethics and Integrity* policy that promoted at all times ***"doing the right thing*,"** which ultimately proved to be a facade to aid in committing theft;

f.            That any delays encountered or to be encountered at the "corporate" level would not be detrimental to the Agreement and that KOSTOLICH would not have to worry about delays being indicative of a breach of Agreement in progress;

g.            That L-3 recognized KOSTOLICH was providing valuable consideration in the form of contributing his intellectual property and that it, in fact, formed the basis of the Coal Dust Compaction Mitigation Project; and,

h.            That vast bulk of the Coal Dust Compaction Mitigation Project business development work, related to the "invention," was created by KOSTOLICH in 2007 prior to ever discussing the concept with L-3. This fact was acknowledged by L-3 through CAD at the time the Agreement was entered into.

71.      That   Stephen informed KOSTOLICH that KGI's inclusion in the Business Plan for the Coal Dust Compaction Mitigation Project, supported by the alleged

self-promoted integrity of the officers of CAD, including Stephen, would be sufficient to protect KOSTOLICH, and that it was unnecessary to enter into any additional agreement.

72.     Despite the statements and representations made and provided to KOSTOLICH by Defendant, L-3, L-3 deliberately breached the Agreement entered into with KOSTOLICH.

73.     KOSTOLICH and KGI performed and/or complied with all of the terms and conditions of the Agreement, including any and all conditions precedent to the relief sought herein.

74.     By reason of Defendant, L-3's, breach of the Agreement, and as a direct and proximate result thereof, KOSTOLICH and KGI have been damaged. These damages include and/or will include, but are not limited to, loss of revenue estimated to be in excess of $7 million dollars per year, delay of revenue, loss of clients and injury to reputation.

75.     By reason of Defendant, L-3's, breach of the Agreement, KOSTOLICH and KGI have been and will continue to be irreparably injured, and have no sole and adequate remedy at law as the damages caused continue to accrue on a daily basis.

76.     Defendant, L-3's, conduct as described in the paragraphs above, unless and until enjoined by order of this Court, will continue to cause irreparable injury to KOSTOLICH and KGI.

77.     KOSTOLICH and KGI have no adequate remedy at law because the amount of damage is impossible to determine, even though estimated to be $7 million dollars per year, and because it is of a character that cannot be solely remedied by money.

78.     KOSTOLICH and KGI have a legitimate business interest in protecting

26

their confidential and proprietary business information related to the Coal Dust Compaction Mitigation Project created by Marcus KOSTOLICH that was misappropriated and stolen by Defendant as part of its deliberate breach of the Agreement entered into, particularly, as said conduct has and will continue to damage the reputation of KOSTOLICH and KGI.

WHEREFORE, KOSTOLICH and KGI pray that this Honorable Court:

(1)     Enter an Injunction, both temporary and permanent, prohibiting Defendant, L-3, from:

a.     Utilizing, disclosing, selling, licensing, or transferring in any way or for any purpose KOSTOLICH's confidential and/or proprietary information or trade secrets as defined in the Business Plan/Agreement related to the Coal Dust Compaction Mitigation Project;

b.     Utilizing in any way or furnishing to any third-party the confidential and/or proprietary information misappropriated by Defendant, L-3, from KOSTOLICH related to the Coal Dust Compaction Mitigation Project, including extracts or copies thereof;

c.     Soliciting or attempting to solicit business of KOSTOLICH using KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project;

d.     Servicing or accepting any business from clients, current or prospective, of KOSTOLICH acquired by Defendant, L-3, by

reason of prior improper use of KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project ;

(2)     Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action;

(3)     Order Defendant, L-3, to pay KOSTOLICH's reasonable expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(4)     Order that Defendant, L-3, pay pre- and post-judgment interest;

(5)     Grant any such other relief as the Court deems just and proper; and,

(6)     Grant trial by jury of all issues triable as of right.

**COUNT II**
**FRAUD IN THE INDUCEMENT**

79.     KOSTOLICH re-adopts and re-alleges each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

80.     Prior to entering into any Agreement, the Defendant, L-3, conspired and acted in concert with its Division known as CAD to create a scheme to intentionally steal the intellectual property of KOSTOLICH by misrepresenting to the Plaintiffs, KOSTOLICH and KGI, that it intended to honor the "Agreement" entered into, accepted, and verified by Defendant, L-3, based on the document entitled "Business Plan," (Exhibit "B,") and which specifically related to the Coal Dust Compaction Mitigation Project created by Marcus KOSTOLICH. The Business Plan, which served as the basis of the "Agreement," was further verified by Defendant through its representative, Stephen, in

28

an Executive Summary dated January 2009. (Exhibit "C").

81.     KOSTOLICH provided valuable consideration in the form of contributing his intellectual property that formed the basis of the Coal Dust Compaction Mitigation Project, and said consideration was recognized and acknowledged by Defendant, but said acknowledgment was calculated to foster detrimental reliance by KOSTOLICH that would allow Defendant to then steal his intellectual property and the attendant revenue to be derived therefrom.

82.     KOSTOLICH provided valuable consideration in the form of contributing his intellectual property that formed the basis of the Coal Dust Compaction Mitigation Project, which Defendant knew had very valuable potential economic benefit that could be derived by the one possessing the intellectual property related thereto.

83.     Specifically, at and prior to the time of the Agreement, the Defendant knew there was no intent on the part of Defendant to honor the Agreement made with Plaintiffs. The Defendants, having gained the trust of KOSTOLICH by promoting its "Mission Statement" and its "Code of Conduct", made the following statements of material fact, with the intent to induce reliance by the Plaintiffs on said statements to Plaintiff's determent, which the Defendant, L-3, knew to be false at the time the statements were made,:

     a.           That L-3 and CAD at all times would work in the best interests of the Coal Dust Compaction Mitigation Project "team" and that KOSTOLICH would at all times be protected;

     b.           That the Consulting Agreement entered into with KOSTOLICH and CAD was recognized by CAD and, specifically,

Stephen, as a separate and distinct agreement that had nothing to do with the Project, and KOSTOLICH relied upon said statements;

c.       That the Business Plan, i.e., the Agreement, created by KOSTOLICH would be honored and the royalties to KOSTOLICH called for would be honored;

d.       That the intellectual property provided by KOSTOLICH and recognized by L-3 was, in fact, the intellectual property of KOSTOLICH and would be cared for in an honorable manner by allegedly honorable men working for a company with a *Code of Conduct* and *Ethics and Integrity* policy that promoted at all times ***"doing the right thing***, which ultimately proved to be a facade to aid in committing theft;*"

e.       That any delays encountered or to be encountered at the "corporate" level would not be detrimental to the Agreement that L-3 induced KOSTOLICH to enter;

f.       That KOSTOLICH would receive the agreed upon royalty of $1.20 per carload; and,

g.       That Stephen informed KOSTOLICH that KGI's inclusion in the Business Plan, supported by the alleged self-promoted integrity of the officers of CAD including Stephen, would be sufficient to protect KOSTOLICH'S rights in the Project, and that it was unnecessary to enter into any additional agreement.

84.    The Plaintiffs, relied on these false statements in entering into the Agreement with the Defendant, L-3, and were induced to provide Defendant their

intellectual property related to the Project, which Defendant then misappropriated unlawfully to its own economic and financial benefit and to the financial detriment of Plaintiffs.

85.    As a result of the fraud in the inducement by Defendant, L-3, the Plaintiffs, KOSTOLICH and KGI, have suffered a loss estimated to be $7 million annually.

86.    Defendant, L-3, as an allegedly successful Department of Defense contractor with a Code of Ethics, fabricated "corporate" delays that were intended to frustrate KGI and KOSTOLICH and give CAD and L-3 a free hand to steal KOSTOLICH'S intellectual property and the entirety of the business he developed, i.e., the Project, which is exactly what it did.   The conduct was intentional, malicious, fraudulent, felonious, and specifically intended to take advantage of one that Defendant perceived to be easily taken advantage of.

87.    By reason of Defendant, L-3's, fraudulent inducement of KGI and KOSTOLICH to enter into the Agreement, and as a direct and proximate result thereof, KOSTOLICH and KGI have been damaged.   These damages include and/or will include, but are not limited to, loss of revenue estimated to be $7 million dollars per year, delay of revenue, loss of clients and injury to reputation.

88.    By reason of Defendant, L-3's, fraudulent inducement, KOSTOLICH and KGI have been and will continue to be irreparably injured, and have no sole and adequate remedy at law, as the damages caused continue to accrue on a daily basis.

89.    Defendant, L-3's, conduct as described in the paragraphs above, unless and until enjoined by order of this Court, will continue to cause irreparable injury to

KOSTOLICH and KGI.

90.     KOSTOLICH and KGI have no adequate remedy at law because the amount of damage is impossible to determine, even though estimated to be $7 million dollars per year, and because it is of a character that cannot be solely remedied by money.

91.     KOSTOLICH and KGI have a legitimate business interest in protecting their confidential and proprietary business information related to the Coal Dust Compaction Mitigation Project created by KOSTOLICH, that was misappropriated and stolen by Defendant, and that Plaintiffs were fraudulently induced to turn over to Defendant as part of the Agreement entered into, particularly, as said conduct has and will continue to damage the reputation of KOSTOLICH and KGI.

**WHEREFORE**, KOSTOLICH and KGI pray that this Honorable Court:

(1)     Enter an Injunction, both temporary and permanent, prohibiting Defendant, L-3, from:

a.     Utilizing, disclosing, selling, licensing, or transferring in any way or for any purpose KGI and KOSTOLICH's confidential and/or proprietary information or trade secrets as defined in the Business Plan/Agreement related to the Project;

b.     Utilizing in any way or furnishing to any third-party the confidential and/or proprietary information misappropriated by Defendant, L-3, from KGI and KOSTOLICH related to the Project, including extracts or copies thereof;

c.     Soliciting or attempting to solicit business of KGI and KOSTOLICH using KOSTOLICH's confidential and/or

proprietary information related to the Project;

d.       Servicing or accepting any business from clients, current or prospective, of KGI and KOSTOLICH acquired by Defendant, L-3, by reason of prior improper use of KGI and KOSTOLICH's confidential and/or proprietary information related to the Project ;

(2)       Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action, and further order judgment for punitive damages based on the conduct;

(3)       Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(4)       Order that Defendant, L-3, pay pre- and post-judgment interest;

(5)       Grant any such other relief as the Court deems just and proper; and,

(6)       Grant trial by jury of all issues triable as of right.

**COUNT III**
**VIOLATION OF CHAPTER 688, FLORIDA STATUTES, THE FLORIDA**
**UNIFORM TRADE SECRETS ACT**

92.       Plaintiffs, KOSTOLICH and KGI, adopt and re-allege each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

93.       Defendant, L-3, was given access to KGI and KOSTOLICH's trade secrets and proprietary and confidential business information, including but not limited

to, client lists, pricing information, contact information, marketing materials and all information and intellectual property created by KGI and KOSTOLICH related to the Coal Dust Compaction Mitigation Project.

94.     Due to the content and nature of KGI and KOSTOLICH's business, KGI and KOSTOLICH has developed a substantial database of valuable confidential business information and substantial relationships with current and prospective clients in the railroad and transportation industry relative to the Coal Dust Compaction Mitigation Project.

95.     KOSTOLICH and KGI take reasonable steps to protect their confidential business information, including, but not limited to, current and prospective client lists and its proprietary database, as well as its business strategy and planning, and pricing structure, including all information relative to the Coal Dust Compaction Mitigation Project.

96.     KGI and KOSTOLICH have developed significant client goodwill in the United States and, specifically, in the Powder River Basin of the Western United States, which Defendant, L-3, has now unlawfully benefitted from.

97.     As detailed above and below, Defendant, L-3, deliberately violated the Agreement made with KOSTOLICH and KGI as identified in the Business Plan, attached as Exhibit "B," which comprises the Agreement and contract entered into between L-3 and KOSTOLICH.

98.     Defendant, L-3, failed to inform KGI and KOSTOLICH that it had already entered into direct competition with KGI and KOSTOLICH by going behind their back and, in fact, had already been diverting monies intentionally from KGI and

KOSTOLICH.   Defendant failed to advise KGI and KOSTOLICH it had already by no later than September 2009 engaged in a scheme to steal confidential and proprietary business information and trade secrets from KGI and KOSTOLICH.

99.      KOSTOLICH and KGI have spent many years and considerable sums of money to develop their client lists, referral lists, trade secrets, and proprietary information, database, pricing structure and strategies, marketing plans and strategies, and salary structure, and to develop and maintain relationships with clients, venture capitalists, contractors, developers, owners, lending institutions, vendors, consultants, designers, companies, and others, and to create and promote the long thought out intellectual property identified as the Coal Dust Compaction Mitigation Project .

100.      KOSTOLICH and KGI also have spent substantial amounts of time, money and effort in developing and maintaining a solid relationship and goodwill with their current client base in the railroad and transportation industries, which they service, and to develop their business strategies and practices, along with the other confidential and proprietary information at issue.

101.      Defendant, L-3's, breach of the Agreement with KOSTOLICH and KGI and its use of KOSTOLICH's confidential and proprietary information relative to the Coal Dust Compaction Mitigation Project, including the prospective patent rights belonging to Plaintiffs, will cause KOSTOLICH and KGI irreparable injury. KOSTOLICH is threatened with losing patent rights and current clients and, therefore, substantial revenues.   KOSTOLICH and KGI have a legitimate business interest in protecting their market share and confidential and proprietary information and trade secrets related to the Coal Dust Compaction Mitigation Project.

102.   KOSTOLICH and KGI have no adequate remedy at law because the amount of damage, though in the millions of dollars, is impossible at present to determine and of a character that cannot be remedied solely by money.

103.   Section 688.003, Florida Statutes, the Florida Uniform Trade Secrets Act, provides that:

(1)   ***Actual or threatened misappropriation [of trade secrets] may be enjoined*** ... in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

\* \* \*

(2)   In appropriate circumstances, ***affirmative acts to protect a trade secret may be compelled by court order.***

104.   Section 688.002(2), Florida Statutes, the Florida Uniform Trade Secrets Act, defines misappropriation as:

(a)   Disclosure or use of a trade secret of another ***without the express or implied consent*** by a person who:

1.   ***Used improper means*** to acquire knowledge of the trade secret; or

2.   At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was...

(a)   ***Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use***; or

(b)   Derived from or through a person ***who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .***

105.   There is a substantial likelihood that KOSTOLICH and KGI will succeed on the merits of this Complaint.

106.   KOSTOLICH and KGI have satisfied all conditions precedent to bringing these claims.

36

107.    KOSTOLICH and KGI have retained the services of the undersigned counsel to represent them in this action and are obligated to pay all reasonable costs, expenses and attorney's fees.

108.    Pursuant to Section 688.005, Florida Statutes, KOSTOLICH and KGI are entitled to recover their reasonable costs, expenses and attorney's fees from Defendant, L-3, if they prevail in this action.

109.    KOSTOLICH and KGI have a legitimate business interest in protecting its confidential and proprietary business information related to the Coal Dust Compaction Mitigation Project created by Marcus KOSTOLICH that was misappropriated and stolen by Defendant, particularly, as said conduct has and will continue to damage the reputation of KOSTOLICH and KGI

WHEREFORE, KOSTOLICH and KGI pray that this Honorable Court:

(1)     Enter an Injunction, both temporary and permanent, prohibiting Defendant, L-3, from:

    a.      Utilizing, disclosing, selling, licensing, or transferring in any way or for any purpose KGI and KOSTOLICH's confidential and/or proprietary information or trade secrets as defined in the Business Plan/Agreement related to the Coal Dust Compaction Mitigation Project;

    b.      Utilizing in any way or furnishing to any third-party the confidential and/or proprietary information misappropriated by Defendant, L-3, from KGI and KOSTOLICH related to the Coal Dust Compaction Mitigation Project, including extracts or copies

thereof;

c.  Soliciting or attempting to solicit business of KGI and KOSTOLICH using KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project;

d.  Servicing or accepting any business from clients, current or prospective, of KGI and KOSTOLICH acquired by Defendant, L-3, by reason of prior improper use of KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project ;

(2)  Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action;

(3)  Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(4)  Order that Defendant, L-3, pay pre- and post-judgment interest;

(5)  Grant any such other relief as the Court deems just and proper; and,

Grant trial by jury of all issues triable as of right.

## COUNT IV (IN THE ALTERNATIVE)
## COMMON LAW MISAPPROPRIATION OF PROPRIETARY AND
## CONFIDENTIAL INFORMATION

110.     KOSTOLICH and KGI re-adopts and re-alleges each and every allegation
contained in paragraphs numbered 1 through 64, as though fully set forth herein.

111.     Defendant, L-3, and CAD, had a confidential relationship with KGI and
KOSTOLICH that survives the wrongful termination of their Agreement with KGI and
KOSTOLICH.

112.     Defendant, L-3, and CAD, possess and/or have knowledge of proprietary
and confidential information belonging to KGI and KOSTOLICH related to the Coal
Dust Compaction Mitigation Project and not known outside of KGI and KOSTOLICH.

113.     Defendant, L-3, obtained such proprietary and confidential information
related to the Coal Dust Compaction Mitigation Project solely by virtue of their
confidential relationship with KGI and KOSTOLICH and thereafter took significant
advantage of same.

114.     KGI and KOSTOLICH take substantial and reasonable measures to
protect their proprietary and confidential information related to the Coal Dust
Compaction Mitigation Project from improper or unauthorized disclosure.

115.     KGI and KOSTOLICH expended substantial time and expense in the
development of the foregoing proprietary and confidential information related to the Coal
Dust Compaction Mitigation Project. That information reflects KOSTOLICH's and
KGI's years of experience in this industry, which could only be acquired or duplicated by
others with great difficulty, if at all.

116.     KGI and KOSTOLICH's proprietary and confidential information is

extremely valuable to competitors, because it allows a competitor to, inter alia, understand KGI and KOSTOLICH's internal rate structure, strategy, technology, business plan, confidential client information and marketing information related to the Coal Dust Compaction Mitigation Project, a project intended to revolutionize the way coal dust is mitigated and remediated.

117.    As alleged above, Defendant, L-3, misappropriated, used and/or disclosed KGI and KOSTOLICH's proprietary and confidential information related to the Coal Dust Compaction Mitigation Project for Defendant, L-3's, benefit, to the direct detriment of KGI and KOSTOLICH, and did so intentionally with the scheme and plan in place to profit from doing so, which it has done.

118.    By reason of Defendant, L-3's, unlawful misappropriation of KGI and KOSTOLICH's confidential and proprietary information related to the Coal Dust Compaction Mitigation Project, KOSTOLICH and KGI have been damaged.  These damages include and/or will include, but are not limited to, loss of clients, loss of revenue estimated to be $7 million annually, delay of client contacts, and injury to reputation.

119.    By reason of Defendant, L-3's, unlawful, intentional, felonious, and willful misappropriation of KGI and KOSTOLICH's confidential and proprietary information related to the Coal Dust Compaction Mitigation Project, KOSTOLICH and KGI have and will continue to be irreparably injured, and have no adequate remedy at law.

    **WHEREFORE**, KOSTOLICH and KGI pray that this Honorable Court:

    (1)        Enter an Injunction, both temporary and permanent, prohibiting Defendant, L-3, from:

40

a.       Utilizing, disclosing, selling, licensing, or transferring in any way or for any purpose KGI and KOSTOLICH's confidential and/or proprietary information or trade secrets as defined in the Business Plan/Agreement related to the Coal Dust Compaction Mitigation Project;

b.       Utilizing in any way or furnishing to any third-party the confidential and/or proprietary information misappropriated by Defendant, L-3, from KGI and KOSTOLICH related to the Coal Dust Compaction Mitigation Project, including extracts or copies thereof;

c.       Soliciting or attempting to solicit business of KGI and KOSTOLICH using KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project;

d.       Servicing or accepting any business from clients, current or prospective, of KGI and KOSTOLICH acquired by Defendant, L-3, by reason of prior improper use of KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project ;

(2)       Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action and further order judgment for punitive damages based on the conduct;

(3)        Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable
expenses, costs and attorney's fees incurred in bringing and prosecuting
this action;

(4)        Order that Defendant, L-3, pay pre- and post-judgment interest;

(5)        Grant any such other relief as the Court deems just and proper;
and,

(6)        Grant trial by jury of all issues triable as of right.

**COUNT VII**
**MISAPPROPRIATION AND INFRINGEMENT OF PATENT RIGHTS**

120.    KGI and KOSTOLICH re-adopt and re-allege each and every allegation
contained in paragraphs numbered 1 through 64, as though fully set forth herein.

121.    Defendant, L-3's, unlawful, intentional, willful, and unauthorized use and
disclosure of KGI and KOSTOLICH's intellectual property related to the Coal Dust
Compaction Mitigation Project, and sale of same through its Division, CAD, as a license
that Defendant did not have the right to sell, constitutes willful misappropriation and
infringement of KGI and KOSTOLICH'S prospective patent rights.

122.    Defendant, L-3, upon information and belief, filed a patent application
with the United States Patent and Trademark Office (USPTO), a provisional application,
that expired in or about June 2010, and that it filed without the knowledge or consent of
KGI and KOSTOLICH.  Once it was discovered what Defendant had done, a "status"
was requested from Defendant with information concerning the provisional application,
names of inventors associated with the application, and the effective filing date, along
with the 8 digit application number of the provisional patent, so that KOSTOLICH could
verify on his own the "status," which was refused.  L-3 refused to provide KOSTOLICH

any information concerning the application despite his request for same and the fact he had standing to make such a request.

123. The intellectual property, i.e., the "invention," created by KGI and KOSTOLICH, according to the United States Patent and Trademark Office (the "USPTO"), would be deemed patentable subject matter, but Defendant, L-3, misappropriated the subject matter without advising KOSTOLICH of its conduct, which he had to discover after the fact. KOSTOLICH was the likely *"Sole Inventor"* based on the law as regulated by the USPTO.

124. L-3 and CAD only took advice from KGI and KOSTOLICH in order to engineer a model of the invention to perform the actual task. U.S. patents can only be filed by the ***actual inventor*** of an invention, but L-3 misrepresented itself to the USPTO falsely as the *"Sole Inventor"* to further perpetrate its scheme to steal from KGI and KOSTOLICH.

125. Defendant already purposely and unlawfully excluded KGI and KOSTOLICH from the patent application process in an effort to perpetrate outright fraud against KOSTOLICH.

126. The benefit of filing a provisional application is that it allows an inventor, such as KOSTOLICH, to achieve an earlier effective filing date when the inventor later files a co-pending non-provisional utility application under 35 U.S.C. §111(a) within one (1) year of the provisional application filing date. If the inventor fails to file a non-provisional utility application within the one (1) year window, all claims for priority to the provisional application are forever lost. But, claims to priority can be lost in other ways and Defendant, L-3, assured that would happen to KOSTOLICH based on its theft

of KOSTOLICH's intellectual property and the offer of sale of same in a public setting.

127.     Defendant, L-3, incorporated claims conceived solely by KOSTOLICH and attempted to pass those claims off to the USPTO as its own as part of the scheme to steal from KGI and KOSTOLICH. Defendant, L-3, did not add any new claims to the "invention" of KOSTOLICH. Instead, L-3 took advice from KOSTOLICH and later engineered only a model of the invention to perform the actual task. MARCUS KOSTOLICH was the "Sole Inventor" of the "invention," and any patent application should have been filed solely in his name in order to withstand judicial scrutiny unless he permitted a filing otherwise, which he did not do.

128.     KGI and KOSTOLICH's legal current status and ability to now protect his patent rights which were willfully, intentionally, and maliciously infringed upon by Defendant, L-3, depends on whether the invention was offered for sale, i.e., whether L-3/CAD have offered it to others, which they did by selling a license to Crown Technology, Inc.

129.     The *"On Sale Bar"* is satisfied when (1) the product has been the issue of a commercial offer for sale and (2) the invention is ready for patenting. Defendant offered the alleged "invention" for sale in a public venue in September 2009, unbeknownst to KGI and KOSTOLICH, and ultimately sold a license to Crown thereafter.

130.     The Sale Bar was created by L-3, which negatively affects the rights of KOSTOLICH and his patent rights, which have been as a result severely damaged by Defendant's conduct. Since L-3 already filed a provisional patent application on the invention, the second element of the On Sale Bar was satisfied and KOSTOLICH's rights

have been damaged, if not lost entirely. Defendant, L-3, released the data to the public domain in September 2009 at the conference held in Denver, Colorado, and in so doing damaged the rights of KOSTOLICH.

131.    That as a direct and proximate result of the willful, malicious, and intentional conduct of Defendant, L-3, Plaintiff, KOSTOLICH, had his patent rights stolen and misappropriated and has suffered significant damages as a result. These damages include and/or will include, but are not limited to, loss of clients, loss of revenue estimated to be $7 million annually, delay of client contacts, and injury to reputation.

132.    KOSTOLICH and KGI have a legitimate business interest in protecting their intellectual property rights and patent rights related to the Coal Dust Compaction Mitigation Project created by MARCUS KOSTOLICH that was misappropriated and stolen by Defendant, particularly, as said conduct has and will continue to damage the reputation of KOSTOLICH and KGI

**WHEREFORE**, KOSTOLICH and KGI pray that this Honorable Court:

(1)    Enter an Injunction, both temporary and permanent, prohibiting Defendant, L-3, from:

a.    Utilizing, disclosing, selling, licensing, or transferring in any way or for any purpose KGI and KOSTOLICH's confidential and/or proprietary information or trade secrets as defined in the Business Plan/Agreement related to the Coal Dust Compaction Mitigation Project;

b.    Utilizing in any way or furnishing to any third-party the confidential and/or proprietary information misappropriated by

Defendant, L-3, from KGI and KOSTOLICH related to the Coal Dust Compaction Mitigation Project, including extracts or copies thereof;

c.       Soliciting or attempting to solicit business of KGI and KOSTOLICH using KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project;

d.       Servicing or accepting any business from clients, current or prospective, of KGI and KOSTOLICH acquired by Defendant, L-3, by reason of prior improper use of KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project ;

(2)       Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action and further order judgment for punitive damages based on the conduct;

(3)       Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(4)       Order that Defendant, L-3, pay pre- and post-judgment interest;

(5)       Grant any such other relief as the Court deems just and proper; and,

(6)       Grant trial by jury of all issues triable as of right.

46

## COUNT VIII
## COMMON LAW UNFAIR COMPETITION

133.    KGI and KOSTOLICH re-adopt and re-allege each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

134.    Defendant, L-3's, use and disclosure of KGI and KOSTOLICH's intellectual property related to the Coal Dust Compaction Mitigation Project, and the illegal sale of a license of said intellectual property rights, constitutes unfair competition with KGI and KOSTOLICH if allowed to occur and continue.

135.    By reason of Defendant, L-3's, unfair competition related to the Coal Dust Compaction Mitigation Project intellectual property and the theft and/or misappropriation of same, KGI and KOSTOLICH has been damaged.  These damages include, but are not limited to, loss of revenue, delay of revenue, loss of clients and injury to reputation.

136.    By reason of Defendant, L-3's, unfair competition, KGI and KOSTOLICH have been and will continue to be irreparably injured, and have no adequate remedy at law.

137.    **WHEREFORE**, KOSTOLICH and KGI pray that this Honorable Court:

(1)    Enter an Injunction, both temporary and permanent, prohibiting Defendant, L-3, from:

a.    Utilizing, disclosing, selling, licensing, or transferring in any way or for any purpose KGI and KOSTOLICH's confidential and/or proprietary information or trade secrets as defined in the Business Plan/Agreement related to the Coal Dust Compaction Mitigation Project;

b.    Utilizing in any way or furnishing to any third-party the

47

confidential and/or proprietary information misappropriated by Defendant, L-3, from KGI and KOSTOLICH related to the Coal Dust Compaction Mitigation Project, including extracts or copies thereof;

c. Soliciting or attempting to solicit business of KGI and KOSTOLICH using KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project;

d. Servicing or accepting any business from clients, current or prospective, of KGI and KOSTOLICH acquired by Defendant, L-3, by reason of prior improper use of KGI and KOSTOLICH's confidential and/or proprietary information related to the Coal Dust Compaction Mitigation Project ;

(2) Order judgment against Defendant, L-3, for compensatory, exemplary, incidental and consequential damages in an amount to be determined at the trial of this action;

(3) Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(4) Order that Defendant, L-3, pay pre- and post-judgment interest; and,

(5) Grant any such other relief as the Court deems just and proper; and,

(6)     Grant trial by jury of all issues triable as of right.

## COUNT IX
## UNJUST ENRICHMENT

138.     KGI and KOSTOLICH re-adopt and re-allege each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

139.     KGI and KOSTOLICH's proprietary and confidential information related to the Coal Dust Compaction Mitigation Project possessed by Defendant, L-3, has economic value and thus constitutes an economic benefit conferred upon Defendant, L-3, by KGI and KOSTOLICH with the understanding that Defendant, L-3, would not transfer that economic benefit to itself or to a competitor of KGI and KOSTOLICH or to another in the railroad transportation industry without the consent of KGI and KOSTOLICH.

140.     Defendant, L-3, and CAD, had no legal right to be enriched through the transfer of that economic benefit related to the Coal Dust Compaction Mitigation Project to them, and to the detriment of KGI and KOSTOLICH.

141.     KGI and KOSTOLICH is entitled to recoup from Defendant, L-3, and/or to disgorge any profits related to any amounts by which Defendant, L-3, and CAD, are unjustly enriched as a consequence of using, disclosing or transferring that economic benefit to themselves or others related to the Coal Dust Compaction Mitigation Project stolen and/or misappropriated by Defendant, L-3, and CAD from KGI and KOSTOLICH.

WHEREFORE, KOSTOLICH and KGI pray that this Honorable Court:

(1)     Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action;

(2)     Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable

49

expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(3)    Order that Defendant, L-3, pay pre- and post-judgment interest; and,

(4)    Grant any such other relief as the Court deems just and proper; and,

(5)    Grant trial by jury of all issues triable as of right.

## COUNT X
## IMPOSITION OF AN EQUITABLE LIEN

142.    KGI and KOSTOLICH re-adopt and re-allege each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

143.    Defendant, L-3, in concert with its division known as CAD, conspired and acted to create a scheme to intentionally steal the intellectual property of KGI and KOSTOLICH by misrepresenting to the Plaintiffs, KOSTOLICH and KGI, that it intended to honor the "Agreement" entered into, accepted, and verified by Defendant, L-3, based on the document entitled "Business Plan," (Exhibit "B,") and which specifically related to the Coal Dust Compaction Mitigation Project created by KOSTOLICH.

144.    KGI and KOSTOLICH also re-adopt and re-allege each and every allegation contained in paragraphs numbered 79 through 89, showing that Defendant, L-3, in concert with its division known as CAD, fraudulently induced KOSTOLICH to enter into the "Agreement," and as a direct and proximate result thereof, KOSTOLICH and KGI have been irreparably injured.

145.    The damages resulting from Defendant, L-3's, fraudulent inducement of KOSTOLICH to enter into the "Agreement" include and / or will include, but are not

limited to, loss of revenue estimated to be $7 million dollars per year, delay of revenue, loss of clients and injury to reputation.

146.    However, KOSTOLICH and KGI have no sole and adequate remedy at law as the damages caused continue to accrue on a daily basis. Defendant, L-3's, conduct as described in the paragraphs above will continue to cause irreparable injury to KOSTOLICH and KGI, unless an equitable lien is placed on all income derived from the use of KOSTOLICH and KGI's intellectual property that formed the basis of the Coal Dust Compaction Mitigation Project. Such a lien will insure that any future revenue derived from KOSTOLICH and KGI's intellectual property is held by Defendant, L-3, for the benefit of KOSTOLICH and KGI.

147.    KOSTOLICH and KGI have no adequate remedy at law because the extent and amount of damage is impossible to determine due to the systemic nature of the violations involved the even though estimated to be $7 million dollars per year, and because it is of a character that cannot be solely remedied by money.

148.    KOSTOLICH and KGI have a legitimate business interest in protecting their confidential and proprietary business information related to the Coal Dust Compaction Mitigation Project created by KOSTOLICH that was misappropriated and stolen by Defendant and that Plaintiffs were fraudulently induced to turn over to Defendant as part of the Agreement entered into, particularly, as said conduct has and will continue to damage the reputation of KOSTOLICH and KGI.

WHEREFORE, KOSTOLICH and KGI pray that this Honorable Court:

(1)    Create an equitable lien requiring Defendant, L-3, to hold all current and future revenue generated from the use of KOSTOLICH's and KGI's

51

intellectual property that formed the basis of the Coal Dust Compaction

Mitigation Project, until the resolution of this instant cause.

(2)      Grant any such other relief as the Court deems just and proper; and,

(3)      Grant trial by jury of all issues triable as of right.

## COUNT XII
## REQUEST FOR AN ACCOUNTING

149.      KGI and KOSTOLICH re-adopt and re-allege each and every allegation

contained in paragraphs numbered 1 through 64, as though fully set forth herein.

150.      Defendant, L-3, in concert with its Division known as CAD, conspired and

acted to create a scheme to intentionally steal the intellectual property of KGI and

KOSTOLICH   to Defendant's own pecuniary advantage by misrepresenting to the

Plaintiffs, KOSTOLICH and KGI, that it intended to honor the "Agreement" entered into,

accepted, and verified by Defendant, L-3, based on the document entitled "Business

Plan," (Exhibit "B") and which specifically related to the Coal Dust Compaction

Mitigation Project created by KOSTOLICH.

151.      KGI and KOSTOLICH also re-adopt and re-allege each and every

allegation contained in paragraphs numbered 79 through 89, showing that Defendant, L-

3, in concert with its division known as CAD, fraudulently induced KGI and

KOSTOLICH to enter into the "Agreement," and as a direct and proximate result thereof,

KOSTOLICH and KGI have been irreparably injured.

152.      As previously stated, the "White Paper" prepared by KOSTOLICH clearly

shows that KOSTOLICH would receive 5% ownership of a Joint Venture Limited

Liability Company, which would be created to market the intellectual property that

formed the basis of the Coal Dust Compaction Mitigation Project.

153.     CAD, as agent for Defendant L-3 and without the legal right to sell such a license, sold an exclusive licensing agreement to Crown Technologies, Inc., for the use of KOSTOLICH and KGI's intellectual property that formed the basis of the Coal Dust Compaction Mitigation Project.

154.     Finally, KOSTOLICH and KGI were instrumental in procuring a Letter of Intent, submitted by Jepland on January 30, 2009, and which would result in KOSTOLICH and KGI receiving substantial revenue.   The misrepresentations of Defendant, L-3, and its agent, CAD, resulted in the loss of potential revenue to KOSTOLICH and KGI under the Letter of Intent, as well as loss of good will between KOTOLICH, KGI and Jepland.

155.     The damages resulting from Defendant, L-3's, fraudulent inducement of KGI and KOSTOLICH to enter into the "Agreement" include and/or will include, but are not limited to, loss of revenue estimated to be $7 million dollars per year.   KOSTOLICH and KGI, are entitled to the revenue both would realize under the arrangement contemplated under the "Business Plan," as well as revenue flowing to the entity to be created under the "White Paper."

156.     KOSTOLICH and KGI have no adequate remedy at law because the amount of damage is impossible to determine, even though estimated to be $7 million dollars per year, and because it is of a character that cannot be solely remedied by money.

WHEREFORE, KOSTOLICH and KGI pray that this Honorable Court:

(1)     Enter Judgment in favor of KOSTOLICH and KGI against Defendant for an accounting and examination of all general ledger and other accounting bookkeeping entries of Defendant showing revenue generated from:

a.   The improper use of KOSTOLICH and KGI's intellectual property that formed the basis of the Coal Dust Compaction Mitigation Project

b.   Any revenue generated from the exclusive license agreement entered into between CAD, as agent of Defendant, L-3, and Crown Technologies, Inc.

c.   Any revenue that would be generated under the Letter of Intent submitted by Jepland on January 30, 2009

(2)   Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action;

**COUNT XIII**
**PETITION FOR DECLARATORY RELIEF**

157.   KGI and KOSTOLICH re-adopts and re-alleges each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

158.   As stated previously, Defendant, L-3, through Mark Stephen and CAD, accepted the written "Business Plan/Agreement" in favor of KGI and KOSTOLICH in Orange County, Florida.   The Agreement is attached hereto as "Exhibit B," and as he confirmed in his own words and writings as noted in "Exhibit C."

159.   KGI and KOSTOLICH respectfully requests the Court to issue an Order and Judgment declaring the respective rights of the parties under the Agreement referenced above, and appended as "Exhibit B," including a determination that the Agreement is valid under current Florida statutory and common law, and provide related thereto any other supplemental relief as the Court deems just and proper under the

circumstances.

**WHEREFORE**, Plaintiffs, KOSTOLICH and KGI, demands judgment declaring the respective rights of the parties under the Agreement between Defendant, L-3, and KOSTOLICH and KGI, for a temporary and permanent injunction, monetary damages, and attorney's fees and costs, as well as any and all other relief deemed just and proper against Defendant, L-3.

## COUNT XIV
## CONVERSION

160.     KGI and KOSTOLICH re-adopt and re-allege each and every allegation contained in paragraphs numbered 1 through 64, as though fully set forth herein.

161.     Defendant, L-3, wrongfully misappropriated business opportunities based upon KOSTOLICH's and KGI's intellectual property related to the Coal Dust Compaction Mitigation Project for Defendant, L-3's, benefit, to the direct detriment of KGI and KOSTOLICH and did so intentionally with the scheme and plan in place to profit from doing so, which it has done.

162.     Specifically, Defendant, L-3, through its agent CAD, wrongfully exercised an ownership interest over intellectual property developed by KOSTOLICH and KGI related to the Coal Dust Compaction Mitigation Project, which was inconsistent with both KOSTOLICH and KGI's rights over said intellectual property. Defendant did so by entering into an exclusive license agreement with Crown Technologies, Inc. for the use of intellectual property developed by KOSTOLICH and KGI related to the Coal Dust Compaction Mitigation Project, without a legal right to such intellectual property.

163.    Through its wrongful sale of an exclusive license agreement with Crown, Defendant L-3 has wrongfully taken an intangible interest in what would otherwise have been a business opportunity and revenue source to KOSTOLICH and KGI.

164.    By reason of Defendant, L-3's, unlawful misappropriation of KGI and KOSTOLICH's information related to the Coal Dust Compaction Mitigation Project, KGI and KOSTOLICH have been damaged.  These damages include and/or will include, but are not limited to, loss of clients, loss of revenue estimated to be greater than $7,000,000.00, annually, delay of client contacts, and injury to reputation.

WHEREFORE, KOSTOLICH and KGI pray that this Honorable Court:

(1)    Order judgment against Defendant, L-3, for compensatory, incidental and consequential damages in an amount to be determined at the trial of this action and further order judgment for punitive damages based on the conduct;

(2)    Order Defendant, L-3, to pay KGI and KOSTOLICH's reasonable expenses, costs and attorney's fees incurred in bringing and prosecuting this action;

(3)    Order that Defendant, L-3, pay pre- and post-judgment interest;

(4)    Grant any such other relief as the Court deems just and proper; and,

(5)    Grant trial by jury of all issues triable as of right.

56

DATED this 19th day of January, 2011.

Respectfully submitted,

_____
W. RILEY ALLEN, ESQUIRE
Florida Bar No.:  338583
J. SCOTT MURPHY, ESQUIRE
Florida Bar No. 373001
ALLEN & MURPHY, P.A.
429 S. Keller Road, Suite 300
Orlando, FL  32810
(407) 838-2000
(407) 838-2022 – Facsimile
RileyAllen@FloridaTrialLawyer.com
ScottMurphy@FloridaTrialLawyer.com


_____
DOMINICK J. SALFI
Florida Bar #070016
SALFI LAW
999 Douglas Avenue, Suite 3324
Altamonte Springs, Florida 32714
(407) 774-2700
(407) 774-7308 – Facsimile
domsalfi@mac.com

ATTORNEYS FOR PLAINTIFF